**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WATERFRONT COMMISSION OF NEW YORK HARBOR, <br><br> Plaintiff, <br><br> v. <br><br> PHILIP MURPHY, in his official capacity as Governor of New Jersey, <br><br> Defendant, <br><br> and <br><br> SENATE PRESIDENT STEPHEN M. SWEENEY, ASSEMBLY SPEAKER CRAIG J. COUGHLIN, NEW JERSEY SENATE, and NEW JERSEY GENERAL ASSEMBLY, <br><br> Intervenor Defendants. | Case No. 18-650 (SDW) (LDW) <br><br><br> **OPINION** <br><br><br> June 1, 2018 |

**WIGENTON,** District Judge.

Before this Court are Plaintiff Waterfront Commission of New York Harbor's (the "Commission" or "Plaintiff") Motion for a Preliminary Injunction pursuant to Federal Rule of Civil Procedure ("Rule") 65, as well as Defendant Philip Murphy ("Governor Murphy") and Intervenor Defendants Stephen M. Sweeney and Craig J. Coughlin's (collectively, "Defendants") Cross Motions to Dismiss Plaintiff's Complaint pursuant to Rules 9(a) and 12(b)(6). Jurisdiction is proper pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391. For the reasons stated herein, Plaintiff's Motion for a Preliminary Injunction is **GRANTED**, and Defendants' Cross Motions to Dismiss are **DENIED**.

# I.    BACKGROUND

In 1953, New York and New Jersey entered into the Waterfront Commission Compact (the "Compact") following various government investigations into pervasive criminal activity and widespread corruption in the Port of New York ("Port").  *See De Veau v. Braisted*, 363 U.S. 144, 147-50 (1960) (discussing the Compact's history); *Nat'l Org. for Women, N.Y. Chapter v. Waterfront Comm'n of N.Y. Harbor*, 468 F. Supp. 317, 318-19 (S.D.N.Y. 1979).  To create the bi-state agreement, the states passed identical statutes in their respective legislatures; and as required under the Compact Clause of the United States Constitution, U.S. Const. art. I, § 10, cl. 3, on August 13, 1953, they obtained Congressional consent to enter the Compact.  Waterfront Commission Compact, Pub. L. No. 83-252, 67 Stat. 541 (1953)[1]; N.J. Stat. Ann. § 32:23-1 *et seq.*[2]; N.Y. Unconsol. Laws § 9801 *et seq*.

Pursuant to the Compact, the States of New Jersey and New York declare

> that the conditions under which waterfront labor is employed within the Port of New York district are depressing and degrading to such labor, resulting from the lack of any systematic method of hiring, the lack of adequate information as to the availability of employment, corrupt hiring practices and the fact that persons conducting such hiring are frequently criminals and persons notoriously lacking in moral character and integrity and neither responsive or responsible to the employers nor to the uncoerced will of the majority of the members of the labor organizations of the employees; that as a result waterfront laborers suffer from irregularity of employment, fear and insecurity, inadequate earnings, an unduly high accident rate, subjection to borrowing at usurious rates of interest, exploitation and extortion as the price of securing employment . . . .

Compact, art. I, ¶ 1.  As part of the bi-state endeavor, a two-member Commission was created as a "body corporate and politic, [and] an instrumentality of the States of New York and New Jersey."

---

[1] Hereinafter, citations to the Compact refer to provisions contained in 67 Stat. 541.

[2] For the purposes of this opinion, citations to New Jersey's statutes refer to the statutory text as published prior to the changes New Jersey approved on January 16, 2018.  *See* 2017 N.J. Sess. Law Serv. ch. 324 (West 2018).

*Id.* art. III, ¶¶ 1-2. The agency was vested with an array of tools to combat corruption on the waterfront. *Id.* art. IV; N.J. Stat. Ann. § 32:23-10 (general powers); N.Y. Unconsol. Laws § 9810 (general powers and duties). Pursuant to these powers, the Commission has "undertaken scores of investigations that have led to the conviction of hundreds of individuals who were conducting illicit activities in the Port, including, but not limited to, drug trafficking, theft, racketeering, illegal gambling, loansharking, and murder[.]" (Compl. ¶ 26a, ECF No. 1.) In addition to investigating criminal activity, the Commission "has also worked to expose the continued corrupt and discriminatory hiring practices on the waterfront and to implement measures to address them." (*Id.* ¶ 27.)

The Compact contains a concurrency requirement, which provides that "[a]mendments and supplements to [the C]ompact . . . may be adopted by the action of the Legislature of either State concurred in by the Legislature of the other." Compact, art. XVI, ¶ 1. Pursuant to this provision, the Compact has been amended numerous times through concurrent legislation.[3] In recent years, this concurrency requirement has been a hindrance to New Jersey's legislature. (*See* Sweeney Decl. ¶¶ 12-13, ECF No. 22-2.) For instance, in 2007, New Jersey passed a bill to amend Section 5-p of the Compact and thereby divest the Commission of its discretion in opening or closing the longshoremen's register.[4] (Sweeney Decl. ¶ 12); *see also* 2007 N.J. Laws 1289. In 2017, New Jersey enacted a bill that would allow New Jersey or New York's governors to veto actions taken at Commission meetings. (Sweeney Decl. ¶ 12); *see also* 2017 N.J. Sess. Law Serv. ch. 201, §

---

[3] *See, e.g.*, 2007 N.J. Laws 2090; 2007 N.Y. Laws 3061; 1999 N.J. Laws 1286; 1999 N.Y. Laws 3016; 1988 N.J. Laws 64; 1988 N.Y. Laws 2096; 1987 N.J. Laws 1382; 1987 N.Y. Laws 2484; 1982 N.J. Laws 76; 1982 N.Y. Laws 1376; 1969 N.J. Laws 406; 1969 N.Y. Laws 2319; 1966 N.J. Laws 51; 1966 N.Y. Laws 701; 1956 N.J. Laws 57; 1956 N.Y. Laws 1160; 1954 N.J. Laws 64; 1954 N.Y. Laws 745.

[4] One of the Commission's duties is to maintain the longshoremen's register, which is a list of all individuals qualified to work as longshoremen. N.J. Stat. Ann. § 32:23-27. Under the Compact, no person can work as a longshoreman within the Port district unless his name is on the longshoremen's register, and no person can employ someone to work as a longshoreman in the district unless that worker is registered. *Id.*

3(e) (West 2018). Neither of these bills amended the Compact because New York did not enact concurring legislation.

## II.     FACTUAL AND PROCEDURAL HISTORY

On December 7, 2017 and January 8, 2018, New Jersey's Senate and General Assembly, respectively, passed New Jersey Senate Bill No. 3502 (the "Bill"), which among other things, withdraws the State of New Jersey from the Compact and dissolves the Commission. (Compl. ¶¶ 1, 43.) As enacted, the Bill directs New Jersey's Governor "to notify the Congress of the United States, the Governor of the State of New York, and the [Commission], of the State of New Jersey's intention to withdraw from . . . the [C]ompact[.]" 2017 N.J. Sess. Law Serv. ch. 324, § 2 (West 2018). On January 15, 2018, New Jersey's then-Governor Chris Christie ("Governor Christie") signed the Bill into law. (Compl. ¶ 43.)

On January 16, 2018, Plaintiff filed a one-count Complaint seeking a declaration that the Bill is invalid, void, and without force and effect, and requesting preliminary and permanent injunctive relief, enjoining Governor Murphy from implementing or enforcing the Bill.[5] (*See generally id.*) On January 17, 2018, Plaintiff filed a Motion for an Order to Show Cause and a Preliminary Injunction. (ECF No. 8.) On January 18, 2018, this Court ordered Governor Murphy to appear on January 25, 2018 and show cause why he should not be enjoined from implementing or enforcing the Bill. (ECF No. 9.) On January 23, 2018, the parties stipulated to an extended briefing schedule, and the show-cause hearing was adjourned to February 22, 2018. (ECF No. 16.) In the interim, on February 1, 2018, this Court granted New Jersey Senate President Stephen M. Sweeney ("Sweeney") and Speaker of the New Jersey General Assembly Craig J. Coughlin's

---

[5] Governor Christie signed the Bill on his last full day in office. Susan K. Livio & Brent Johnson, *Christie Era Ends with a Flurry of Bills to Sign: Outdoing Governor Approves Regulations for Drones, Disbands SPCA & More*, Times (Trenton, N.J.), Jan. 16, 2018, 2018 WLNR 1540678. As such, Plaintiffs are suing his successor, Governor Murphy. (*See generally* Compl.)

("Coughlin") Motion to Intervene. (ECF Nos. 17-18.) On February 6, 2018, Governor Murphy opposed Plaintiff's Motion for a Preliminary Injunction, and cross moved to dismiss the Complaint. (ECF No. 21.) On the same day, Sweeney and Coughlin also opposed Plaintiff's motion, and cross moved to dismiss.[6] (ECF No. 22.) On February 13, 2018, Plaintiff replied in support of its motion and opposed Defendants' cross motions. (ECF No. 29.) Governor Murphy replied in support of his Cross Motion to Dismiss on February 16, 2018. (ECF No. 30.) On February 21, 2018, New Jersey's Senate and General Assembly moved to intervene. (ECF No. 35.) On February 22, 2018, after the show-cause hearing was conducted, this Court reserved decision on the parties' motions with the exception of the legislative bodies' Motion to Intervene, which was granted. (ECF Nos. 37, 39.)

### III. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) may present either a facial or factual attack to a court's subject matter jurisdiction. "A facial attack 'contests the sufficiency of the complaint because of a defect on its face,' whereas a factual attack 'asserts that the factual underpinnings of the basis for jurisdiction fail to comport with the jurisdictional prerequisites.'" *Halabi v. Fed. Nat'l Mortg. Ass'n*, No. 17-1712, 2018 WL 706483, at *2 (D.N.J. Feb. 5, 2018) (internal citations omitted). When reviewing facial attacks, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (citing *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012)). In contrast, with a factual attack, "a court may weigh and 'consider evidence outside the pleadings.'" *Id.* (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)).

---

[6] Sweeney and Coughlin filed a letter brief and a declaration enumerating their arguments in addition to adopting and incorporating by reference the facts and legal arguments set forth in Governor Murphy's moving brief. (ECF No. 22.)

As with facial attacks under Rule 12(b)(1), when considering a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the alleged facts in favor of the nonmoving party." *Id.* In so doing, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (external citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) (discussing the *Iqbal* standard). Additionally, Rule 8(a)(2) requires a complaint to set forth a "short and plain statement of the claim showing that a pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips*, 515 F.3d at 231 (stating that Rule 8 "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief").

## IV.    DISCUSSION

### A.    Cross Motions to Dismiss

Before reaching Plaintiff's request for injunctive relief, this Court will first address Defendants' arguments in support of their cross motions to dismiss.

#### i.    Standing

A federal court's jurisdiction under Article III of the United States Constitution is limited to cases and controversies "which are appropriately resolved through the judicial process." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "A motion to dismiss for want of standing is . . . properly

brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Aichele*, 757 F.3d at 357 (3d Cir. 2014) (citing *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007)).

A plaintiff has standing if it can show that:

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist*., 832 F.3d 469, 476 (3d Cir. 2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000). In the context of a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Blunt,* 767 F.3d at 279 (quoting *Lujan*, 504 U.S. at 561).

Here, Plaintiff asserts that it has standing because it has an interest in "prevent[ing] its extinction." (Pl.'s Reply Br. at 14, ECF No. 29.) The Bill declares that the Compact and Commission will be dissolved ninety days after the Governor notifies Congress, New York, and the Commission of New Jersey's intention to withdraw from the Compact. 2017 N.J. Sess. Law Serv. ch. 324, § 3 (West 2018) (defining "transfer date"); *id.* § 31 (dissolving the Compact and Commission as of the transfer date). Thereafter, the "powers, rights, assets, and duties of the [C]ommission within [New Jersey]," will be vested with the Division of State Police in the Department of Law and Public Safety. *Id.* §§ 3, 4(b)(1)-(2). Plaintiffs allege that the Bill will also permit New Jersey to "poach" the Commission's employees and divert the Commission's funding sources to New Jersey State Police. (Pl.'s Mem. Supp. Mot. for Prelim. Inj. at 15, ECF No. 8-1.) Based on the Bill's directives, if Governor Murphy is not enjoined from implementing the Bill,

the Commission will be divested of its assets and will cease to exist. Thus, Plaintiff has articulated sufficient facts to establish standing in this matter.

*ii. Sovereign Immunity*

A motion to dismiss based on the Eleventh Amendment is properly brought under Rule 12(b)(1) because sovereign immunity "is a jurisdictional bar which deprives federal courts of subject matter jurisdiction." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n.2 (3d Cir. 1996) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984)).

Governor Murphy suggests that he is immune from suit under the Eleventh Amendment. (Def.'s Br. in Supp. of Cross Mot. to Dismiss [hereinafter Def.'s Br.] at 18 n.7, ECF No. 21-1.) However, "[s]uits for injunctive relief against state officials brought to end ongoing violations of federal law are not barred by the Eleventh Amendment." *Rhett v. Evans*, 576 F. App'x 85, 88 n.2 (3d Cir. 2014) (citing *Ex parte Young*, 209 U.S. 123 (1908)). This is because "a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State." *Mercer Cty. Childrens Med. Daycare, LLC v. O'Dowd*, No. 13-1436, 2014 WL 546346, at *3 (D.N.J. Feb. 10, 2014) (quoting *Green v. Monsour*, 474 U.S. 64, 68 (1985)); *see also Ex parte Young*, 209 U.S. 123. To determine whether the exception to immunity applies, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)); *Green*, 474 U.S. at 68.

Here, Plaintiff alleges that a state statute (i.e., the Bill) contravenes federal law (i.e., the Compact). Interstate compacts are not only contracts between states, but also federal statutes. *Alabama v. North Carolina*, 560 U.S. 330, 351-52 (2010); *Alcorn v. Wolfe*, 827 F. Supp. 47, 52

(D.D.C. 1993).  Consent from Congress in 1953 transformed the Compact into a law of the United States.  *See Neb., ex rel. Nelson v. Cent. Interstate Low-Level Radioactive Waste Comm'n*, 834 F. Supp 1205, 1210 (D. Neb. 1993) (quoting *Cuyler v. Adams*, 449 U.S. 433, 438 (1981)).  Because the Bill seeks to undo the Compact, which has the force and effect of federal law, Governor Murphy is not entitled to sovereign immunity.

### iii.    Rule 12(b)(6)

Defendants also challenge whether: (a) this suit was properly brought on behalf of the Plaintiff; (b) Plaintiff, as an instrumentality of the States of New Jersey and New York, may sue one of the compacting states; (c) Plaintiff's power to sue under the Compact is limited to persons; and (d) Plaintiff has articulated a cause of action.

### a.    Authority to Bring Suit

"Except when required to show that the court has jurisdiction, a pleading need not allege . . . a party's capacity to sue or be sued . . . [or] a party's authority to sue or be sued in a representative capacity[.]"  Fed. R. Civ. P. 9(a)(1).  Rather, "the onus is on an opposing party to challenge a party's capacity to sue or be sued."  *Nahas v. Shore Med. Ctr.*, No. 13-6537, 2018 WL 1981474, at *4 (D.N.J. Apr. 27, 2018).  Generally, a defense of lack of capacity or authority to sue may be examined in a Rule 12(b)(6) motion "when the defect appears upon the face of the complaint."  *Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965).  However, when matters beyond the pleadings are considered, the Rule 12(b)(6) motion must be treated as one for summary judgment under Rule 56.  Fed. R. Civ. P. 12(d).

Notwithstanding, a court may consider a "document *integral to or explicitly relied* upon in the complaint . . . without converting the motion [to dismiss] into one for summary judgment."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted).

"The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated '[w]here the plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." *Id.* (quoting *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993)). Allowable documents include the Complaint, "exhibits attached to the [C]omplaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Guidotti v. Legal Helpers Debt Resolution*, 716 F.3d 764, 772 (3d Cir. 2013) (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)); *see also In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, No. 11-3121, 2012 WL 6554386, at *2 (D.N.J. Dec. 14, 2012) (noting that courts may consider legislative history on a motion to dismiss) (citing *Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226-27 (1959)). Therefore, although they are not attached to the Complaint, this Court may consider the Compact, its bylaws, and the legislative history associated with these documents in deciding the Cross Motions to Dismiss.

Here, Defendants contend that the Commission's General Counsel Phoebe Sorial ("Sorial") did not have the authority to retain outside counsel and file this suit on behalf of the Commission. Although the Compact states that the Commission "shall act only by unanimous vote of both members thereof[,]" it also provides that the Commission's powers and duties may be exercised by its officers, employees, and agents, with the exception of its "power to make rules and regulations." Compact, arts. III, ¶ 3, IV (referring to concluding paragraph). Thus, the Commission may designate its power "[t]o sue" as well as its power to "retain and employ counsel and private consultants on a contract basis or otherwise[.]" *Id*. art. IV, ¶¶ 1, 5. Furthermore, the Commission's bylaws created officer positions, such as Executive Director, Commission Counsel, and Secretary. (Bylaws, McGahey Cert. Ex. A, at II, ECF No. 21-3.) Under those same bylaws,

Commission Counsel is explicitly authorized to "handle . . . legal matters and perform such other duties as may be assigned to him by the Commission or the Executive Director." (Bylaws at 6-7.) Thus, for the purposes of a motion to dismiss, Defendants have not demonstrated that Sorial lacks authority to commence legal actions on behalf of the Commission, including the instant suit.

Even if Defendants' cross motions were converted to summary judgment motions, and the certifications and declarations annexed to the parties' briefs were considered, this Court would reach the same conclusion. Summary judgment would also warrant a finding that Sorial did not require the unanimous vote of the commissioners to bring this action. Defendants rely on a certification from one of the Commission's two members, Commissioner Michael Murphy ("Commissioner Murphy"). Commissioner Murphy avers that he "was not asked to approve, nor [has he] approved or authorized the Commission to file [this] . . . lawsuit." (Comm'r Murphy Cert. ¶ 5, ECF No. 21-2.) Plaintiff in turn provides a declaration from the only other commissioner, Ronald Goldstock ("Commissioner Goldstock"), in which he asserts that the Commission was not required to authorize the lawsuit, and that "[e]ven if it were, [he] fully authorize[s] and ratif[ies] the Commission's actions in this matter[.]" (Comm'r Goldstock Decl. ¶ 11, ECF No. 29-4.) Additionally, the Commission's Executive Director Walter Arsenault ("Arsenault") affirmed that he has delegated to Sorial "the power to bring legal actions[.]" (Arsenault Reply Decl. ¶ 5, ECF No. 29-1.) Importantly, Commissioner Goldstock has advised the Court that as of January 30, 2018, Commissioner Murphy "has decided to recuse himself" from any matter relating to the Bill.[7] (Comm'r Goldstock Decl. ¶¶ 9-10.)

Thus, even if a unanimous vote of the commissioners was needed to file this suit, one has ratified Sorial's actions, and the other has recused himself from this matter entirely. (*Id.* ¶¶ 10-

---

[7] Commissioner Murphy's recusal was undisputed during the show-cause hearing on February 22, 2018.

11.) Defendants have not pointed to anything in the Compact, its bylaws, or relevant case law to support their argument that both commissioners' votes are needed to constitute a quorum.[8]  As such, this Court is persuaded that Commissioner Goldstock's approval would be sufficient to authorize Sorial's actions in bringing this suit.

Additionally, the Commission's past practices are particularly instructive in determining whether the unanimous vote of the commissioners was required before filing suit.  *See Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 636 (2013) ("A party's course of performance under the Compact is highly significant evidence of its understanding of the compact's terms." (quoting *Alabama*, 560 U.S. at 346) (internal quotation marks and alterations omitted)).  Since its creation in 1953, "the Commission has filed approximately 83 legal proceedings in the state and federal courts of New York and New Jersey and was named as a defendant/respondent in over 420 other cases." (Arsenault Reply Decl. ¶ 6.)  In its sixty-five-year history, neither the Executive Director nor General Counsel have been required to obtain authorization from the commissioners to commence these law suits.  (*Id.*; *see also* Sorial Decl. ¶ 8, ECF No. 29-2.)  Thus, even applying the summary judgment standard, this Court would conclude that Sorial, as General Counsel, has authority to bring suit on behalf of the Commission.

### b.  Instrumentality of the States of New Jersey & New York

Defendants argue that the Commission cannot sue the State of New Jersey or its officials because "federal law does not often create rights for . . . agencies to assert against other arms of the State."  *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 264 (2011).  However, Compact Clause entities are not equivalent to state agencies.  The Supreme Court has previously

---

[8] This Court notes that New Jersey and New York previously attempted but failed to amend the Compact to define a quorum.  In 1970, both states passed statutes to increase the number of Commissioners from two to four members, define a quorum as three members, and mandate that the Commission "act only by a majority vote of all its members."  N.J. Stat. Ann. §§ 32:23-8, -9; N.Y. Unconsol. §§ 9808-09.  However, the amendment was conditioned upon consent from Congress, which was never obtained.  *See* N.J. Stat. Ann. § 32:23-225; 1970 N.Y. Laws 2951.

differentiated the two types of entities for Eleventh Amendment purposes. *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 42 (1994). In holding that the Port Authority Trans-Hudson Corporation ("PATH") was not entitled to the same immunity as a state agency, Justice Ginsburg explained that bistate agencies created by compact "owe their existence to state and federal sovereigns acting cooperatively, and not to any one of the United States[.]" *Id.* (internal quotation marks omitted). As such, they "are not subject to the unilateral control of any one of the States that compose the federal system." *Id.* In another case involving PATH, Justice Brennan emphasized that "[t]he inherent nature of interstate agencies precludes their being found so intricately intertwined with the State as to constitute an 'arm of the State.'" *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 312 (1990) (Brennan, J., concurring in part and in the judgment). Thus, the Complaint will not be dismissed on the basis that it has been brought against an official of a compacting state.[9]

### c. Commission's Power to Sue

Based on N.J. Stat. Ann. § 32:23-90,[10] Defendants argue that the Commission's ability to sue under the Compact is limited to civil actions against persons, and not States. However, the statutory language Defendant relies upon was added to the Compact in 1954, along with the following instructive provision:

> This amendatory and supplementary act, except section 12, constitutes an agreement between the States of New York and New Jersey supplementary to the waterfront commission compact and

---

[9] This Court further notes that a compact agency has previously sued a compacting state. *See, e.g.*, *Kan. City Area Transp. Auth. v. Missouri*, 640 F.2d 173 (8th Cir. 1981).

[10] The statute provides:

> The commission may maintain a civil action against any *person* to compel compliance with any of the provisions of the compact, or to prevent violations, attempts or conspiracies to violate any such provisions, or interference, attempts or conspiracies to interfere with or impede the enforcement of any such provisions or the exercise or performance of any power or duty thereunder, either by mandamus, injunction or action or proceeding in lieu of prerogative writ.

N.J. Stat. Ann. § 32:23-90 (emphasis added); *see also* N.Y. Unconsol. Law § 9910 (concurring New York statute).

> amendatory thereof, and shall be liberally construed to effectuate the
> purposes of said compact, and the powers vested in the waterfront
> commission hereby *shall be construed to be in aid of and
> supplemental to and not in limitation of or in derogation of any of
> the powers heretofore conferred* upon or delegated to the waterfront
> commission.

1954 N.J. Laws 64, 68 (emphasis added); *see also* 1954 N.Y. Laws 745, 748 (containing similar language). Defendants have not demonstrated that the 1954 amendments limited the Commission's power to sue and be sued, or to administer and enforce the provisions of the Compact. *See* Compact, art. IV, ¶¶ 1, 6.

### d. Cause of Action

Defendants argue that Plaintiff cannot maintain a cause of action that is solely premised on a violation of the Supremacy Clause. (Def.'s Br. at 15); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015) (holding that the Supremacy Clause is not the source of any federal rights.) However, here, Plaintiff's right to sue for declaratory and injunctive relief stems from the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the Compact. Furthermore, because Plaintiff alleges it is immune under federal law from state regulation, it is in the Court's purview to "issue an injunction upon finding the state regulatory actions preempted." *Armstrong*, 135 S. Ct. at 1384 (citing *Ex parte Young*, 209 U.S. at 155-56); *see also Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144-45, 147 (2d Cir. 2016) (distinguishing *Armstrong*, and concluding that Congress did not intend to foreclose plaintiffs from invoking equitable jurisdiction to challenge a town's enforcement of local laws enacted in alleged violation of a federal statute).

Defendants further argue that because compacts are construed as contracts, the appropriate party to bring a "breach of compact" claim would be parties to the Compact, such as New York.[11] However, as discussed above, interstate compacts that require Congressional consent are not merely bi-state contracts, but also federal statutes. *See Alabama*, 560 U.S. at 351-52; *Alcorn*, 827 F. Supp. at 52. Thus, Plaintiff need not "stand-in" for New York or Congress to bring this suit.

Based on the foregoing, Plaintiff has pled sufficient facts to survive a motion to dismiss.

B. Injunctive Relief

To obtain a preliminary injunction, a plaintiff must establish (i) it is likely to succeed on the merits of its claims, (ii) it is likely to suffer irreparable harm without relief, (iii) the balance of harms favors it, and (iv) relief is in the public interest. *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citing *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014)).[12]

i. *Likelihood of Success*

For the purposes of a preliminary injunction, "the plaintiff need only prove a prima facie case, not a certainty that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001). This requires a showing that is significantly better than "negligible," but not necessarily "more likely than not." *Reilly*, 858 F.3d at 179.

---

[11] Courts often refer to compacts as contracts between states and interpret them accordingly. *See, e.g.*, *Texas v. New Mexico*, 482 U.S. 124, 128 (1987) ("It remains a legal document that must be construed and applied in accordance with its terms." (citation omitted)); *Petty v. Tenn.-Mo. Bridge Comm'n*, 359 U.S. 275, 285 (1959) ("A Compact, is after all, a contract."). As a party to the agreement, New York could have sued to enjoin New Jersey from withdrawing from the Compact. Additionally, Congress could have intervened as it expressly reserved "[t]he right to alter, amend, or repeal this Act[.]" Compact, art. XVI, § 2. However, at this juncture, New York and Congress have remained silent in the instant action.

[12] The Third Circuit has referred to the first two elements as "gateway factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If they are met, "a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

The question before this Court is whether the Bill's directives to unilaterally withdraw the State of New Jersey from the Compact are preempted because they conflict with the Compact, as a federal law. "Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Bell v. Cheswick Generating Station*, 734 F.3d 188, 193 (3d Cir. 2013) (quoting *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010)).

As a threshold matter, the Bill is not entitled to a presumption of constitutionality. "The presumption against pre-emption is rooted in respect for the States as independent sovereigns in our federal system and assume[s] that Congress does not cavalierly pre-empt state laws." *Tarrant Reg'l Water Dist.*, 569 U.S. at 631 n.10 (quotation marks omitted) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009)). However, this presumption does not apply "[w]hen the States themselves have drafted and agreed to the terms of a compact, and Congress' role is limited to approving that compact[.]" *Id.*

The Compact at issue does not explicitly address how a state may withdraw from or end it. Jurisprudence dictates that a court's role in compact construction is to "effectuate the clear intent of both sovereign states," not to rewrite their agreement. *Int'l Union of Operating Eng'rs, Local 542 v. Del. River Joint Toll Bridge Comm'n*, 311 F.3d 273, 276 (3d Cir. 2002) (citing *Texas v. New Mexico*, 462 U.S. 554, 564-65 (1983)). Courts may not order relief inconsistent with the express terms of a compact. *Texas*, 462 U.S. at 564; *see also Tarrant Reg'l Water Dist.*, 569 U.S. at 628 (describing the express terms of a compact as "the best indication of the intent of the parties"); *N.Y. Shipping Ass'n, Inc.*, 835 F.3d 344, 353 (3d Cir. 2016) ("[W]e treat the Compact like any other federal statute, and interpret it accordingly." (citing *Texas,* 482 U.S. at 128)).

Additionally, courts must remain cognizant of the agreement's purpose, and "any interpretive principles mandated by the Compact." *Nebraska v. Cent. Interstate Low-Level Radioactive Waste Comm'n*, 207 F.3d 1021, 1023 (8th Cir. 2000).

The Compact's concurrency requirement is germane to this Court's interpretive analysis. *See* Compact, art. XVI, ¶ 1 ("Amendments and supplements to this compact . . . may be adopted by the action of the Legislature of either State concurred in by the Legislature of the other."). Additionally, the Compact instructs that "[i]n accordance with the ordinary rules for construction of interstate compacts this compact shall be liberally construed to eliminate the evils described therein and to effectuate the purposes thereof." *Id.*, art. XVI, ¶ 3; *see also Cent. Interstate Low-Level Radioactive Waste Comm'n*, 207 F.3d at 1026 ("If the provisions of the Compact at issue in this appeal were ambiguous, reliance on the Compact's liberal construction clause and statement of purpose would be appropriate to help resolve the ambiguity."). Based on the foregoing provisions, this Court finds that the Bill's directives to unilaterally withdraw from and nullify the Compact directly conflicts with the Compact. Allowing one state to dictate the manner and terms of the Commission's dissolution, and the subsequent distribution of the agency's assets, runs counter to the requirement that any change to the Compact occur through concurring legislation.

Defendants mistakenly rely on the Supreme Court's rationale in *New Jersey v. New York*, 523 U.S. 767 (1998), to argue that the common law of contracts speaks in the silence of the Compact, and where a contract is silent on withdrawal, either party may do so after a reasonable time. That case concerned an 1834 compact between New Jersey and New York whereby both states agreed that Ellis Island was part of New York despite its location. *Id.* After 1891, the National Government began filling the island's shoreline, adding 24.5 acres to the originally three-acre island. *Id.* at 770. Thereafter, the parties disputed which state had sovereign authority over

the filled land. *Id.* at 771. Justice Souter, delivering the opinion of the Court, held that the common-law doctrine of avulsion "speaks in the silence of the Compact," such that the filled land remained the sovereign property of New Jersey. *Id.* at 783. The Supreme Court explained that there was no reason to address the legal consequences of landfilling in the compact because they "were sufficiently clear under the common law as it was understood in 1834." *Id.* at 783. This Court finds that the holding in *New Jersey v. New York*, was not so broad as to instruct that where a compact is silent as to any issue in dispute, the parties intended common law to fill the gaps. Rather, the Supreme Court's holding was narrowly tailored to a dispute over territorial jurisdiction. Interpreting the holding otherwise would be to ignore Justice White's explanation in *Oklahoma v. New Mexico*, 501 U.S. 221 (1991), that it is appropriate to look to legislative history and extrinsic evidence to interpret an ambiguous compact. *Id.* at 235 n.5.

Defendants further contend that legislative history supports their interpretation that the Compact was meant to exist for a limited duration. (Def.'s Br. at 23.) There is no dispute that the Compact could be terminated if it outlived its usefulness.[13] Rather, the disagreement is over the unilateral manner and method by which New Jersey seeks to end the Compact.[14] Ultimately, the states had an opportunity to include provisions regarding withdrawal from or termination of their agreement;[15] and only Congress explicitly reserved "[t]he right to alter, amend, or repeal this Act." *Id.* art. XVI, § 2.

---

[13] Thus, provisions were included in the Compact requiring the Commission to "make annual and other reports to the Governors and Legislatures of both States . . . stat[ing] the commission's finding and determination" as to the public necessity of several of its main functions. Compact, art. IV, ¶ 13.

[14] Although not determinative, it is worth noting that in 2015, Governor Christie vetoed a bill directing him to withdraw New Jersey from the Compact. *See* S.B. No. 2277, 216th Sess. (N.J. 2014). In issuing a conditional veto, he stated: "I am advised that federal law does not permit one state to unilaterally withdraw from a bi-state compact approved by Congress. As a result, it is premature for New Jersey to contemplate withdrawing from the Waterfront Commission until New York considers similar legislation." (Cardozo Decl., Ex. 3, at 2, ECF No. 8-5.)

[15] "Looking to the customary practices employed in other interstate compacts also helps us to ascertain the intent of the parties to this Compact." *Tarrant Reg'l Water Dist.*, 569 U.S. at 633 (citations omitted). Though Defendants argue that it can be assumed that the states intended to allow unilateral withdrawal at any time, through the years

Moreover, case law regarding unilateral withdrawal contradicts Defendants' position. Though the Supreme Court previously declined to decide whether a compact could be read "to allow any signatory State to withdraw from its obligations at any time[,]" the Court opined: "It requires no elaborate argument to reject the suggestion that an agreement solemnly entered into between States by those who alone have political authority to speak for a State can be unilaterally nullified, or given final meaning by an organ of one of the contracting States." *State ex rel. Dyer v. Sims*, 341 U.S. 22, 26 (1951).[16] The Supreme Court has also recognized that one classic indicium of a compact is that a state is not "free to modify or repeal its law unilaterally." *See Ne. Bancorp, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 472 U.S. 159, 175 (1985). Furthermore, in a concurring opinion, Justice Brennan stated that "[w]hile a State has plenary power to create and destroy its political subdivisions, a State enjoys no such hegemony over an interstate agency." *Feeney*, 495 U.S. at 314 (Brennan, J., concurring in part and in the judgment).[17]

---

interstate compacts have often included express withdrawal provisions. *See, e.g.*, Omnibus Low-Level Radioactive Waste Interstate Compact Consent Act, Pub. L. No. 99-240, § 221, 99 Stat. 1842, 1863 (1986) ("Any party state may withdraw from this compact by enacting a statute repealing its approval."); Act of June 1, 1977, Pub. L. No. 95-35, 91 Stat. 175, 176 (1977) ("This compact shall continue in force and remain binding upon each party State until the Legislature or Governor of each or either State takes action to withdraw therefrom; provided that such withdrawal shall not become effective until six months after the date of the action taken by the legislature or Governor."); Act of Dec. 24, 1970, Pub. L. No. 91-575, § 1.5, 84 Stat. 1509, 1512 (1970) ("The duration of this compact shall be for an initial period of 100 years from its effective date, and it shall be continued for additional periods of 100 years if . . . none of the signatory states . . . notif[y] the commission of intention to terminate the compact[.]"); Interstate Compact on Mental Health Act, Pub. L. No. 92-280, § 2, 86 Stat. 126, 130 (1972) ("A state party to this compact may withdraw therefrom by enacting a statute repealing the same."); Act of Sept. 15, 1960, Pub. L. No. 86-794, 74 Stat. 1031, 1035 (1960) ("Any signatory may withdraw from the compact upon one year's written notice to that effect to the other signatories."); Act of Aug. 24, 1954, Pub. L. No. 83-642, 68 Stat. 783, 785 (1954) ("This compact shall continue in force and remain binding on each state ratifying it until the legislature or the Governor of such state takes action to withdraw therefrom."); Act of Aug. 8, 1953, Pub. L. No. 83-226, 67 Stat. 490, 493 (1953) ("This Compact may be terminated at any time by consent of a majority of the compacting states and territories. . . . Any state or territory may at any time withdraw from this Compact by means of appropriate legislation to that end.").

[16] One district court has further stated that the terms of a "compact cannot be modified unilaterally by state legislation and take precedence over conflicting state law." *Alcorn*, 827 F. Supp. at 52 (first citing *McComb v. Wambaugh*, 934 F.2d 474, 479 (3d Cir. 1991); then citing *Kan. City Area Transp. Auth.*, 640 F.2d at 174).

[17] On May 21, 2018, after the motions in this matter were fully briefed, Defendants directed this Court's attention to the Supreme Court's recent decision in *Murphy v. Nat'l Collegiate Athletic Ass'n*, Nos. 16-476, 16-477, 2018 WL 2186168 (S. Ct. May 14, 2018) [hereinafter *NCAA*]. (ECF Nos. 40-41.) Plaintiff replied on May 22, 2018. (ECF No. 42.) The *NCAA* Court held that a provision in the federal Professional and Amateur Sports Protection Act ("PASPA") violates the anticommandeering doctrine because it "unequivocally dictates what a state legislature may and may not do." *Id.* at *13. *NCAA*'s holding has no bearing on the instant matter. Congress has not passed a statute dictating

19

Based on the foregoing, Plaintiff has established that it is likely to succeed on the merits. This Court will not construe the Compact in a manner that rewrites the agreement to include the right to unilateral withdrawal.[18]

ii. *Irreparable Harm*

"In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm." *Checker Cab of Phila. Inc. v. Uber Techs., Inc.*, 643 F. App'x 229, 232 (3d Cir. 2016) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992)). Economic injuries that can be compensated with a monetary award do not constitute irreparable harm. *Uber Techs., Inc.*, 643 F. App'x at 232.

As discussed above, the Bill divests Plaintiff of its "powers, rights, assets, and duties." 2017 N.J. Sess. Law Serv. ch. 324, § 4(b)(1) (West 2018). Most of Plaintiff's functions would be transferred to the New Jersey State Police, and the Commission would be dissolved. The dissolution of the Compact and the Commission is the statutorily-mandated outcome. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (explaining that the irreparable injury must be "likely" and not merely a possibility). Thus, this Court finds that Plaintiff has demonstrated

---

what New Jersey's legislature may or may not do. Rather, this case concerns whether New Jersey can unilaterally withdraw from an interstate compact that it drafted and voluntarily entered into. Therefore, the anti-commandeering doctrine is not at issue here.

[18] Despite Defendants' insistence that New Jersey has always had the ability to unilaterally withdraw from the Compact, in 2015, 2016, and 2018, resolutions were introduced to New Jersey's State Assembly to request that the United States Congress repeal the Compact. A.C.R. 90, 218th Leg. (N.J. 2018); A.C.R. 68, 217th Leg. (N.J. 2016); A.C.R. 217, 216th Leg. (N.J. 2015); *see also* S.C.R. 168, 216th Leg. (N.J. 2015) (concerning identical resolution introduced to New Jersey's State Senate in 2015). In each instance, the resolutions did not reach a house vote. *Id.* If it was understood that a compacting state had the option to withdraw at any time, it begs the question why legislators would bother to introduce these resolutions year after year.

that it will suffer irreparable harm unless Governor Murphy is enjoined from implementing the Bill.[19]

### iii. Balance of Harms

Plaintiff argues that, at a minimum, the Bill would "cripple the Commission" and leave it unable to carry out its duties as mandated under the Compact. (Arsenault Decl. ¶ 18, ECF No. 8-7.) The Commission would lose a majority of its funding because 90 percent of its operating budget is derived from assessments from Port employers based in New Jersey. (*Id.* ¶ 19.) Without these assessments, the Commission alleges it would not be able to meet its financial obligations and would have to lay off its employees. (*Id.* ¶¶ 20-21.) Economic injuries aside, Plaintiff also alleges that the Bill would result in two separate entities overseeing activity in a single Port, which would result in "confusion, inefficiencies, and harm to citizens of both New York and New Jersey[.]" (*Id.* ¶ 24.) Without a centralized system to complete background checks and register dockworkers, waterfront employees would be subject to differing rules in New York and New Jersey despite working in the same Port. (*Id.* ¶ 25.) Furthermore, the Bill eliminates provisions in the Compact that Plaintiff maintains "is the Commission's primary tool for ensuring fair and non-discriminatory hiring practices, and for preventing extortion of Port workers." (*Id.* ¶ 26.) For example, it removes Section 5-p, "which allows the Commission to regulate the register of available labor as well as to ensure that hiring is made in a fair and nondiscriminatory manner" as well as Section 8, "which allows the Commission to remove union officials convicted of a felony[.]" (Compl. ¶ 43g.) In opposition, Defendants primarily argue that the Commission "has over-regulated the business at the port" and has become "an impediment to future job growth and

---

[19] Although this Court finds that Plaintiff has satisfied the "irreparable harm" prong in the preliminary injunction analysis, it should also be noted that "[c]ourts have found that 'an alleged constitutional infringement will often alone constitute irreparable harm.'" *Am. Express Travel Related Servs. Co., Inc. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 614 (D.N.J. 2010) (quoting *Ass'n for Fairness in Bus. v. New Jersey*, 82 F. Supp. 2d 353, 359 (D.N.J. 2000)).

prosperity at the port." (Def.'s Br. at 5); *see also* 2017 N.J. Sess. Law Serv. ch. 324, § 1(b) (West 2018).

The hardships that Plaintiff alleges will occur without a preliminary injunction are not "illusory;" rather, they are realistic and expansive. Therefore, this Court finds that the imminent harm to the Commission's functions and operations outweighs Defendants' impetus to foster potential economic growth.

### iv.    Public Interest

As discussed above, the Commission works to reform corrupt and discriminatory hiring practices in the Port. (Compl. ¶ 27.) For instance, in 2013, the Commission amended its rules "to require employers in the industry to submit a certification that the persons they are hiring have been selected in a fair and non-discriminatory basis[.]"[20] (Compl. ¶ 30.) The Commission also investigates illicit activities in the Port. (*Id.* ¶ 26a.) Arsenault, the Commission's Executive Director, avers that "organized crime still very much continues to exist on the waterfront." (Arsenault Reply Decl. ¶ 11.) He notes that in 2014, the ILA's former local president, Thomas Leonardis ("Leonardis"), "along with numerous other ILA union officials, shop stewards and foreman pled guilty . . . to [an] extortion conspiracy of their own union members on behalf of the Genovese Organized Crime Family." (*Id.* ¶ 11.) Less than four months before Leonardis was arrested, he testified before New Jersey's legislature, urging that the Commission was "archaic." (*Id.*) Most recently, the "Commission was instrumental in the investigation that led to the indictments of 19 members of the Luchese family on May 31, 2017." (*Id.* ¶ 10 n.6).

---

[20] Thereafter, membership organizations, employer associations, and labor organizations, such as the New York Shipping Association, Inc. ("NYSA") and the International Longshoremen's Association, AFL-CIO ("ILA"), sued the Commission and sought a preliminary injunction to enjoin the implementation of the certification requirement. *See N.Y. Shipping Ass'n. Inc. v. Waterfront Comm'n of N.Y. Harbor*, No. 13-7115, 2014 WL 4271630 (D.N.J. Aug. 27, 2014), *aff'd*, 835 F.3d 344 (3d Cir. 2016) (affirming dismissal).

Relying on information from the NYSA and ILA, Defendants argue that organized crime has been driven out of the Port and that State Police are "suited to undertake an investigation of any criminal activity[.]" (Intervenor-Defs.' Br. at 3-4, ECF No. 22-1.) Defendants assert that the Bill "would seamlessly transfer the regulatory powers of the Commission to the Division of State Police in New Jersey," and thus, there would be "no risk of 'corruption, extortion, and racketeering' once the Commission is dissolved." (Def.'s Br. at 39-40; *see also* Intervenor-Def.'s Br. at 3-4.) Despite these assurances, the Bill also recognizes "a continued need to regulate port-located business to ensure fairness and safety[.]" 2017 N.J. Sess. Law Serv. ch. 324, § 1(c) (West 2018).

Based on the foregoing, it is in the public interest for the Commission to continue its investigatory and regulatory work. Furthermore, upon careful consideration, each of the four factors weigh in favor of granting a preliminary injunction. The relief sought will preserve the status quo of a sixty-five-year-old Compact that embodies a concerted effort between New Jersey, New York, and Congress during the pendency of this matter.

## V.    CONCLUSION

For the reasons set forth above, Plaintiff's Motion for a Preliminary Injunction is **GRANTED**, and Defendants' Cross Motions to Dismiss are **DENIED**. An appropriate Order follows.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:       Clerk
cc:         Leda Dunn Wettre, U.S.M.J.
            Parties