**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WATERFRONT COMMISSION OF NEW YORK HARBOR,<br><br>Plaintiff,<br><br>v.<br><br>PHILIP MURPHY, in his official capacity as Governor of New Jersey,<br><br>Defendant,<br><br>and<br><br>SENATE PRESIDENT STEPHEN M. SWEENEY, ASSEMBLY SPEAKER CRAIG J. COUGHLIN, NEW JERSEY SENATE, and NEW JERSEY GENERAL ASSEMBLY,<br><br>Intervenor Defendants. | Case No. 18-650 (SDW) (LDW)<br><br>**OPINION**<br><br>May 29, 2019 |

**WIGENTON,** District Judge.

Before this Court are: 1) Plaintiff Waterfront Commission of New York Harbor's (the "Commission" or "Plaintiff") Motion for Summary Judgment; and 2) Defendant Philip Murphy ("Governor Murphy") and Intervenor Defendants the New Jersey Senate, the New Jersey General Assembly, Stephen M. Sweeney, and Craig J. Coughlin's ("Intervenor Defendants") (collectively, "Defendants") Cross Motions for Summary Judgment, brought pursuant to Federal Rule of Civil Procedure ("Rule") 56. Jurisdiction is proper pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391. For the reasons stated herein, Plaintiff's Motion for Summary Judgment is **GRANTED**, and Defendants' Cross Motions for Summary Judgment are **DENIED**.

I.     **BACKGROUND**[1]

For decades, criminal activity and corrupt hiring practices pervaded New York and New Jersey's waterfronts in the Port of New York (the "Port"). *See De Veau v. Braisted*, 363 U.S. 144, 147-48 (1960); *N.Y. Shipping Ass'n. Inc. v. Waterfront Comm'n of N.Y. Harbor*, 835 F.3d 344, 348-49 (3d Cir. 2016); *Nat'l Org. for Women, N.Y. Chapter v. Waterfront Comm'n of N.Y. Harbor*, 468 F. Supp. 317, 318-19 (S.D.N.Y. 1979). In November 1951, New York's Governor Thomas E. Dewey ("Governor Dewey") ordered "a sweeping investigation" of the Port. (ECF No. 61-5 at 211.) Pursuant to his agreement with New Jersey's Governor Alfred E. Driscoll ("Governor Driscoll"), the New York Crime Commission ("Crime Commission") worked closely with New Jersey's public authorities to conduct the study. (*Id.*) Following extensive hearings and interviews,[2] in May 1953, the Crime Commission published a detailed report calling for "drastic action" and proposing that New York's Legislature create a division of port administration headed by a governor-appointed commissioner. (*Id.* at 211, 244-45.) Shortly thereafter, the New Jersey Law Enforcement Council issued a report agreeing with and joining in the Crime Commission's findings. (*Id.* at 119-21.)

In June 1953, New York and New Jersey passed identical statutes to enter the Waterfront Commission Compact (the "Compact"), create the Waterfront Commission (the "Commission"), and remedy the deplorable conditions in the Port. (Gov.'s Supplemental Statement of Material Facts ("SMF") ¶¶ 46-47, ECF No. 61-2); *see also* N.J. Stat. Ann. § 32:23-1 *et seq.*[3]; N.Y. Unconsol.

---

[1] This Court assumes the parties' familiarity with the factual background and procedural history in this matter and will summarize only those facts relevant to the instant motions.

[2] "The [Crime C]ommission examined . . . over 700 witnesses, held about 1,000 hearings, took over 30,000 pages of testimony, conducted over 4,000 interviews." (*Id.*)

[3] For the purposes of this opinion, citations to New Jersey's statutes refer to the statutory text as published prior to the changes New Jersey approved on January 16, 2018. *See* 2017 N.J. Sess. Law Serv. ch. 324 (West 2018).

Laws § 9801 *et seq*. On August 12, 1953, the States obtained Congressional consent to enter the Compact. Waterfront Commission Compact, Pub. L. No. 83-252, 67 Stat. 541 (1953).[4] Notwithstanding amendments through concurrent legislation, the Compact has remained in effect for over sixty-five years.

## II.     FACTUAL AND PROCEDURAL HISTORY

On January 15, 2018, New Jersey's then-Governor Chris Christie ("Governor Christie") signed into law Chapter 324 of the 2017 New Jersey Public Laws (the "Act"). (Pl.'s SMF ¶ 7, ECF No. 58-3.) Among other things, the Act directs New Jersey's Governor to "notify the Congress of the United States, the Governor of the State of New York, and the [Commission], of the State of New Jersey's intention to withdraw from . . . the [C]ompact" and declares that ninety days after such notice is given, the Compact and Commission will be dissolved. 2017 N.J. Sess. Law Serv. ch. 324, §§ 2, 31 (West 2018); *see also id.* § 3 (defining "transfer date").

On January 16, 2018, Plaintiff filed a one-count Complaint seeking a declaration that the Act is invalid, void, and without force and effect, and requesting preliminary and permanent injunctive relief, enjoining Governor Murphy, Governor Christie's successor, from implementing or enforcing the Act.[5] (ECF No. 1.) On June 1, 2018, this Court granted Plaintiff's Motion for a Preliminary Injunction and denied Defendants' Cross Motions to Dismiss. (ECF Nos. 43-44.) On September 14, 2018, Magistrate Judge Leda Dunn Wettre granted Plaintiff leave to file a motion for summary judgment and stayed discovery during the pendency of such a motion. (ECF No. 57.) Pursuant to an extended briefing schedule, Plaintiff filed a motion for summary judgment on October 12, 2018. (ECF No. 58.) Governor Murphy and Intervenor Defendants filed their

---

[4] Hereinafter, citations to the Compact refer to provisions contained in 67 Stat. 541.

[5] In February 2018, this Court granted the Intervenor Defendants' motions to intervene. (ECF Nos. 18, 37.)

respective opposition briefs and cross motions for summary judgment on November 29, 2018. (ECF Nos. 60-61.)  Plaintiff replied on December 13, 2018.  (ECF No. 62.)

### III.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law."  *Id.* at 248.  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings.  *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's

evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23. Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002).

## IV. DISCUSSION[6]

### A. Authority to Bring Suit

This Court previously addressed whether Plaintiff's General Counsel Phoebe Sorial ("Sorial") had the authority to retain outside counsel and commence this action on behalf of the Commission. (*See* June 1, 2018 Opinion at 9-12, ECF No. 43.)[7] At this juncture, Defendants

---

[6] To the extent that Defendants reargue points made in their Motions to Dismiss, this Court need not address those arguments in full again in deciding the parties' Motions for Summary Judgment.

[7] As explained in this Court's prior opinion:

> Although the Compact states that the Commission "shall act only by unanimous vote of both members thereof[,]" it also provides that the Commission's powers

5

contend that Plaintiff's Motion for Summary Judgment is premature without discovery relating to Defendants' argument "that the Commission lack[ed] authority to file the complaint[.]" (Rule 56(d) Decl. ¶¶ 10, 36, ECF No. 61-8.) Although Intervenor Defendants adopt and incorporate by reference Governor Murphy's arguments, they also cross move for summary judgment on this very same issue. (ECF No. 60-1 at 1, 24.) This Court will first address Defendants' joint request for discovery before turning to Intervenor Defendants' cross motion for summary judgment.

### i. Ripeness for Summary Judgment

Rule 56(d) delineates a party's recourse if additional discovery is needed to oppose summary judgment. *See Pa.*, *Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 157 (3d Cir. 2012) (citing *Dowling v. City of Phila.*, 855 F. 2d 136, 139 (3d Cir. 1988)). The rule provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery[.]" Fed. R. Civ. P. 56(d)(2). The declarant must specify "what particular information . . . is sought; how, if disclosed, it would preclude summary judgment; and why it has not been previously obtained." *Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015) (quoting *Dowling*, 855 F.2d at 140). Though Rule 56(d) requests are often granted "as a matter of course," they may be denied when "the discovery request[s] pertain[] to facts that are not material to the

---

and duties may be exercised by its officers, employees, and agents, with the exception of its "power to make rules and regulations." Compact, arts. III, ¶ 3, IV (referring to concluding paragraph). Thus, the Commission may designate its power "[t]o sue" as well as its power to "retain and employ counsel and private consultants on a contract basis or otherwise[.]" *Id*. art. IV, ¶¶ 1, 5. Furthermore, the Commission's bylaws created officer positions, such as Executive Director, Commission Counsel, and Secretary. (Bylaws, McGahey Cert. Ex. A, at II, ECF No. 21-3.) Under those same bylaws, Commission Counsel is explicitly authorized to "handle . . . legal matters and perform such other duties as may be assigned to him by the Commission or the Executive Director." (Bylaws at 6-7.)

(June 1, 2018 Opinion at 10-11.)

moving party's entitlement to judgment as a matter of law." *Id.* (citations omitted); *see also In re Taylor*, 548 F. App'x 822, 825 (3d Cir. 2013) ("Where information sought is not relevant to the court's inquiry, a Rule 56(d) motion for discovery may be denied." (citing *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 230 (3d Cir. 1987))).

Here, Defendants have failed to set forth a genuine need for the discovery delineated in their Rule 56(d) declaration. Investigating the Commission's "procedures for retaining outside counsel[,]" cross examining witnesses about customs and practices, and determining whether "Commission staff have []ever . . . filed affirmative litigation of this nature and import without prior notice to the Commissioners," (Rule 56(d) Decl. ¶¶ 26-27, 31), is immaterial. *In re Taylor*, 548 F. App'x at 825 ("In regard[] to a summary judgment motion, a fact is material if proof of its existence or nonexistence 'might affect the outcome of the suit.'" (quoting *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012))). This matter is ripe for adjudication on summary judgment because it presents "pure questions of law[.]" *See Hollus v. Amtrak Ne. Corridor*, 937 F. Supp. 1110, 1113 (D.N.J. 1996). Therefore, Defendants' request to stay or deny Plaintiff's Motion for Summary Judgment pursuant to Rule 56(d) is denied.

> ii. *Cross Motion for Summary Judgment*

As discussed in detail in this Court's prior opinion, Sorial had the authority to commence this action. (*See* June 1, 2018 Opinion at 9-11.) In sum, the Commission has numerous powers and duties that can be delegated to its officers, including the power "[t]o sue" and "retain and employ counsel and private consultants on a contract basis or otherwise[.]" Compact, art. IV., ¶¶ 1, 5. Pursuant to the Commission's bylaws ("Bylaws"), Commission Counsel shall, *inter alia*, "handle other legal matters and perform such other duties as may be assigned to [her] by the Commission or the Executive Director." (ECF No. 58-2 at 66-67.) Furthermore, the

Commission's Executive Director Walter Arsenault has affirmed that he "delegated to General Counsel the power to bring legal actions and to defend lawsuits filed against the Commission." (Arsenault Decl. ¶ 5, ECF No. 58-2.) Based on the plain text of the Compact, the Bylaws, as well as the certifications and declarations annexed to the parties' briefs, this Court finds that Sorial had the capacity to commence the instant action. It is further noted that it would be inappropriate for this Court to constrain the types of suits Commission Counsel may bring or handle on behalf of the Commission given the Commission's underlying, general power "[t]o sue and be sued."[8] *See* Compact art. IV, ¶ 1.

Even if the Commission was required to explicitly authorize the commencement of this suit, it is undisputed that one of the two commissioners has recused himself from the matter entirely, (Pl.'s SMF ¶ 21), and the other has submitted a declaration stating that he "fully authorize[s] and ratif[ies]" Sorial's actions, (Comm'r Goldstock Decl. ¶ 11, ECF No. 58-2). Intervenor Defendants rely on *Texas v. New Mexico*, 462 U.S. 554 (1983), and *F.T.C. v. Flothill Products, Inc.*, 389 U.S. 179 (1967), in support of their argument that Sorial needed approval from a quorum constituting both commissioners. However, *Texas v. New Mexico* did not opine on the minimum number of votes needed if one member of a two-member commissioner recuses himself from voting altogether. Rather, it addressed whether the Supreme Court could order a non-voting member of the Pecos River Commission to vote or otherwise empower a third-party to serve as a tiebreaker in contravention of the Pecos River Compact. 462 U.S. at 564-65.   Furthermore,

---

[8] This matter is distinguishable from instances where boards lacked broad authority to sue or be sued. *See, e.g.*, *Ass'n of Bds. of Visitors of N.Y. State Facilities for Mentally Disabled v. Prevost*, 471 N.Y.S. 2d 342 (N.Y. App. Div. 1983) (explaining that the petitioner lacked the capacity to institute the legal proceeding because it only had the power to investigate charges and subpoena witnesses); *Pooler v. Pub. Serv. Comm'n*, 397 N.Y.S. 2d 425 (N.Y. App. Div. 1977) (finding that the Executive Director of the State Consumer Protection Board did not have the capacity to commence a proceeding because "the Legislature has not seen fit to confer authority on [the Executive Director] or the [Consumer Protection Board] to sue or be sued").

though the Supreme Court in *F.T.C. v. Flothill Products, Inc.* held that a federal agency was "not inhibited" from following the common-law rule of a quorum, 389 U.S. at 185, it did not "*mandate* a quorum rule for the SEC or any other agency[,]" *S.E.C. v. Feminella*, 947 F. Supp. 722, 726 (S.D.N.Y. 1996).

This Court will not construe Commissioner Michael Murphy's abstention from the matter as the functional equivalent of his having disapproved of Sorial's actions. *Cf. Arnold v. E. Air Lines, Inc.*, 712 F.2d 899, 903-04 (4th Cir. 1983) (reasoning that where a circuit court judge had recused himself from a matter, "[i]t would obviously contradict the purpose of disqualification to treat the situation precisely as though the disqualified judge had voted 'No[]'"). Because Commissioner Ronald Goldstock is the only commissioner who is willing or able to express his approval or disapproval of this action, this Court is persuaded that his approval and ratification are sufficient to authorize this lawsuit.

Based on the foregoing, Intervenor Defendants' cross motion for summary judgment, as it relates to the Commission's authority to commence this action, is denied.

B. <u>Unilateral Withdrawal</u>[9]

The Court will next address whether the Act's directives to unilaterally withdraw the State of New Jersey from the Compact conflict with the Compact itself. "Interstate compacts are construed as contracts under the principles of contract law." *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 628 (2013) (citing *Texas v. New Mexico*, 482 U.S. 124, 128 (1987)). "As with any contract, the analysis begins with the express terms of the Compact as the best

---

[9] In his August 24, 2018 letter to the Court, Governor Murphy's counsel argued that discovery as to legislative history was needed to resolve whether and how New York and New Jersey intended to handle termination or withdrawal from the Compact. (Aug. 24, 2018 Letter at 2, ECF No. 54.) However, this issue was not raised again in Governor Murphy's Rule 56(d) declaration. Instead, Defendants now cross move for summary judgment on New Jersey's right to unilaterally withdraw from the Compact.

9

indication of the intent of the parties . . . [b]ut, if the text of the Compact is ambiguous, we must then turn to other interpretive tools to shed light on the intent of the Compact's drafters." *Wayne Land & Mineral Grp., LLC v. Del. River Basin Comm'n*, 894 F.3d 509, 527 (3d Cir. 2018) (citations and quotation marks omitted).

   i. *Express Terms of the Compact*

Though the Compact does not have an express provision addressing how a state may withdraw from or terminate it, it is not completely silent as to those matters. For example, upon consenting to and enacting the Compact, Congress expressly reserved "[t]he right to alter, amend, or repeal" it. Compact § 2. Thus, the Compact could be terminated through an act of Congress.[10] Additionally, Article XVI of the Compact provides: "Amendments and supplements to this compact to implement the purposes thereof may be adopted by the action of the Legislature of either State concurred in by the Legislature of the other." Compact, art. XVI, ¶ 1. Because this concurrency requirement applies to alterations to the Compact, it applies *a fortiori* to New Jersey's withdrawal from and termination of the Compact, the most substantial types of change.

To date, New York's Legislature has not enacted concurring legislation to ratify the Act. (Pl.'s SMF ¶ 10.) Regardless of this fact, the Act not only withdraws New Jersey from the Compact, it transfers the "powers, rights, assets, and duties of the [C]ommission within [New Jersey]" to New Jersey's Division of State Police (the "Division"). 2017 N.J. Sess. Law Serv. ch. 324, § 4(b)(1) (West 2018). To effectuate these objectives, the statute directs the Commission to make "information concerning its property and assets, contracts, operations, and finances within New Jersey" available to the Division, and orders the Commission's officers to deliver funds of

---

[10] Though Defendants argue that this provision is not part of the Compact because it was not proposed by either New York or New Jersey, the Supreme Court has explained that states that act under a compact "assume the conditions that Congress under the Constitution attached." *Petty v. Tenn.-Mo. Bridge Comm'n*, 359 U.S. 275, 281-82 (1959).

the Commission that are applicable to the State of New Jersey to the State's Treasurer. *Id.* §§ 4(a), 4(b)(2). It is particularly troubling that under the Act, New Jersey seeks to distribute and assume jointly held assets and properties. *See Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 314 (1990) (Brennan, J., concurring in part and in the judgment) (explaining that once States enter a compact to create an interstate agency, "no one State has complete dominion over property, owned and proprietary activities operated, by such an agency").

"Allowing one state to dictate the manner and terms of the Commission's dissolution, and the subsequent distribution of the agency's assets, runs counter to the requirement that any change to the Compact occur through concurring legislation." (June 1, 2018 Opinion at 17.) Because the Act's unilateral directives unambiguously conflict with the Compact's concurrency requirement, Plaintiff's motion for summary judgment is granted and Defendants' cross motions for summary judgment are denied.

### ii. Compact Drafters' Intent

Even if the Compact was ambiguous as to withdrawal and termination, this Court would reach the same outcome. Where a compact is ambiguous, courts have looked to "other interpretive tools to shed light on the intent of the Compact's drafters[,]" such as legislative history, the parties' course of performance, customary practices employed in other interstate compacts, and the "background notion 'that States do not easily cede their sovereign powers[.]'" *Wayne Land & Mineral Grp.*, 894 F.3d at 527 (quoting *Tarrant Reg'l Water Dist.*, 569 U.S. at 631). Those sources lead this Court to the conclusion that the Compact drafters did not intend to permit the type of unilateral withdrawal and termination prescribed under the Act.

a. Legislative History

In May 1953, the Crime Commission recommended that New York enact two statutes, "one setting up a Division of Port Administration; the other providing that all labor organizations must meet certain minimum standards." (ECF No. 61-4 at 86.) In June 1953, Governor Dewey held public hearings to "provide [an] opportunity for representative groups who have other proposals to present them publicly." (*Id*. at 74, 79.) During those hearings, Special Counsel to the Crime Commission Theodore Kiendl ("Kiendl") responded to concerns that there was no time limitation to the proposed remedial measures and that the State of New York would regulate the Port indefinitely.[11] Kiendl explained that the proposed legislation included an annual reporting requirement that "was intended to give the Legislature an opportunity to end this legislation." (*Id*. at 238.) A similar provision was later included in the Compact.[12]

Defendants argue that the legislative history behind the Compact's annual reporting requirement shows that the drafters never intended for the Commission to permanently regulate the Port. As this Court previously noted, "[t]here is no dispute that the Compact could be

---

[11] Father John M. Corridan of the Xavier Institute of Industrial Relations asked whether the Crime Commission's recommendations could be enacted "as a trial experiment for three years, subject to review at the end of that period." (*Id*. at 203.) James Danahy, the General Manager of the West Side Association of Commerce, similarly suggested "that any law which is submitted definitely include a provision that the setting up of these agencies . . . definitely end at three years unless the Legislature, in its judgment in the meantime determines that it should be prolonged further." (*Id*. at 237.)

[12] Specifically, it provides that

> annual reports [to the Governors and Legislatures of both States] shall state the [C]ommission's finding and determination as to whether the public necessity still exists for (a) the continued registration of longshoremen, (b) the continued licensing of any occupation or employment required to be licensed hereunder and (c) the continued public operation of the employment information centers provided for in Article XII[.]

Compact, art. IV, ¶ 13.

terminated if it outlived its usefulness. Rather, the disagreement is over the unilateral manner and method by which New Jersey seeks to end the Compact." (June 1, 2018 Opinion at 18.)

In that regard, the legislative record underscores the importance of New York and New Jersey's cooperative efforts. Beginning in 1951, New York's Crime Commission and New Jersey's Law Enforcement Council worked together to investigate the Port's conditions. (ECF No. 61-5 at 65.) During the public hearings in 1953, speakers stressed the need for parallel or uniform legislation to truly remedy the Port's problems.[13] The Commissioner of the Department of Marine and Aviation of the City of New York, Edward F. Cavanagh, Jr., referred to the Port as "one homogeneous entity," and explained that "divid[ing] it into two parts, as between the State of New York and the State of New Jersey, would not be the efficient, practical, final, lasting recommendation that we could join in." (ECF No. 61-4 at 279-80.) Similarly, Governor Dewey stated:

> We intend to cooperate with the State of New Jersey. . . . [I]t is my earnest hope that whatever is done will be done on a parallel basis, and I for one shall not recommend anything to the Legislature until there have been extensive conferences between the representatives of the two states to ascertain whether we cannot work out some method of joint action if no better solution comes.

(*Id.* at 90.)

Finally, when the Compact was presented to Congress, Governor Driscoll, described the Compact as a "concerted drive against organized crime in the North Jersey-New York metropolitan area." (ECF No. 61-5 at 65.) He stated:

---

[13] Robert W. Dowling, the President of the Citizens Budget Commission stated: "We earnestly urge that the State of New Jersey be asked to cooperate fully in similar action." (ECF No. 61-4 at 234.) Because the proposed agency in New York would have no control over port operations in New Jersey, James A. Farrell, Jr., the Chairman of the Committee on Harbors & Shipping of the Chamber of Commerce of the State of New York, emphasized "the desirability of legislation in New Jersey establishing a parallel [entity] . . . in that state with duties identical to those assigned to the New York division." (*Id.* at 217.) However, Frank S. Hogan, the District Attorney of New York County, expressed that "[e]ven if New Jersey enacts a statute identical to that of New York, it would seem that two commissions are less likely to achieve uniformity than would one." (*Id.* at 151.)

13

> It was apparent that we were dealing with a single shipping industry operating in a single harbor bisected artificially by the accident of a historical boundary line between the two States. It was plain from the beginning that the only real solution would depend upon the creation of a single bistate agency to deal with this indivisible problem.

(*Id*.) Furthermore, he referred to the program as the "equal responsibility of both States" even though there were a disproportionate number of longshoremen employed on New York's side of the Port at the time. (*Id*.)[14]

These statements reflect the Compact drafters' understanding that the Port is best served through bi-state cooperation. Thus, the legislative history suggests that the two States would confer to determine whether their endeavor was no longer necessary.

      b. Course of Performance

The remedial measures initially proposed in 1953 were described as "temporary." (ECF No. 61-4 at 154.) In a letter to New York's legislature, Governor Dewey wrote that it was his "earnest hope . . . that the Waterfront Commission need not be permanent and that government regulation may be terminated as quickly as possible after gangsters and hoodlums have been removed from the [P]ort and decency restored." (*Id.* at 355.) These aspirational statements, however, have been rendered somewhat meaningless because in practice, the Compact has remained in effect for over sixty-five years.

Since 1953, New York and New Jersey have worked together to effectuate any changes to the Compact.[15] It was only in recent years that New Jersey's Legislature began taking steps to

---

[14] This Court notes that according to the Act, presently, "more than 82 percent of the cargo and 82 percent of the work hours are on the New Jersey side of the port." 2017 N.J. Sess. Law Serv. ch. 324, § 1 (West 2018).

[15] *See, e.g.*, 2007 N.J. Laws 2090; 2007 N.Y. Laws 3061; 1999 N.J. Laws 1286; 1999 N.Y. Laws 3016; 1988 N.J. Laws 64; 1988 N.Y. Laws 2096; 1987 N.J. Laws 1382; 1987 N.Y. Laws 2484; 1982 N.J. Laws 76; 1982 N.Y. Laws 1376; 1969 N.J. Laws 406; 1969 N.Y. Laws 2319; 1966 N.J. Laws 51; 1966 N.Y. Laws 701; 1956 N.J. Laws 57; 1956 N.Y. Laws 1160; 1954 N.J. Laws 64; 1954 N.Y. Laws 745.

either withdraw from or repeal the Compact. For example, on March 9, 2015, it passed a bill that directed the governor to withdraw New Jersey from the Compact. (Pl.'s SMF ¶ 11); *see also* S.B. No. 2277, 216th Sess. (N.J. 2014). In issuing a conditional veto, Governor Christie stated: "I am advised that federal law does not permit one state to unilaterally withdraw from a bi-state compact approved by Congress. As a result, it is premature for New Jersey to contemplate withdrawing from the . . . Commission until New York considers similar legislation." (Pl.'s SMF ¶ 11.) Furthermore,

> in 2015, 2016, and 2018, resolutions were introduced to New Jersey's State Assembly to request that the United States Congress repeal the Compact. A.C.R. 90, 218th Leg. (N.J. 2018); A.C.R. 68, 217th Leg. (N.J. 2016); A.C.R. 217, 216th Leg. (N.J. 2015); *see also* S.C.R. 168, 216th Leg. (N.J. 2015) (concerning identical resolution introduced to New Jersey's State Senate in 2015). In each instance, the resolutions did not reach a house vote. *Id.* If it was understood that a compacting state had the option to withdraw at any time, it begs the question why legislators would bother to introduce these resolutions year after year.

(June 1, 2018 Opinion at 20 n.18.) Ultimately, the parties' course of performance over the past sixty-five years supports the understanding that any change to the Compact, including withdrawal, requires concurrent legislation.

### c. Customary Practices

"Looking to the customary practices employed in other interstate compacts also helps us to ascertain the intent of the parties to this Compact." *See Tarrant Reg'l Water Dist.*, 569 U.S. at 633 (citing *Alabama v. North Carolina*, 560 U.S. 330 (2010); *Oklahoma v. New Mexico*, 501 U.S. 221, 235 n.5 (1991); *Texas v. New Mexico*, 462 U.S. 554, 565 (1983)). Generally, one distinguishing feature of a compact is that a state is not "free to modify or repeal its law unilaterally." *See Ne. Bancorp, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 472 U.S. 159, 175 (1985) (analyzing classic indicia of compacts to determine whether Massachusetts and

15

Connecticut's statutes constituted a *de facto* compact). Compacts that intend to deviate from this norm have express provisions that permit withdrawal through notice or legislative action.[16]

The absence of comparable language in the Compact is significant and weighs against Defendants' interpretation that the States understood that they could withdraw unilaterally.[17] *See, e.g.*, *Tarrant Reg'l Water Dist.*, 569 U.S. at 633-34 (finding that because many compacts unambiguously permit signatory States to cross each other's borders to fulfill obligations under the compact, the absence of such a provision in the Red River Compact "strongly suggests that the cross-border rights were never intended to be part of the States' agreement"). Additionally, this Court is not aware of, and Defendants have not cited to, any instance in which a single state has dictated the terms and conditions of its withdrawal from a compact without relying on a permissive provision.

---

[16] *See, e.g.*, Act of June 1, 1977, Pub. L. No. 95-35, 91 Stat. 175, 176 (1977) ("This compact shall continue in force and remain binding upon each party State until the Legislature or Governor of each or either State takes action to withdraw therefrom[.]"); Interstate Compact on Mental Health Act, Pub. L. No. 92-280, § 2, 86 Stat. 126, 130 (1972) ("A state party to this compact may withdraw therefrom by enacting a statute repealing the same."); Act of Sept. 15, 1960, Pub. L. No. 86-794, 74 Stat. 1031, 1035 (1960) ("Any signatory may withdraw from the compact upon one year's written notice to that effect to the other signatories."); Act of Aug. 24, 1954, Pub. L. No. 83-642, 68 Stat. 783, 785 (1954) ("This compact shall continue in force and remain binding on each state ratifying it until the legislature or the Governor of such state takes action to withdraw therefrom."); Act of Aug. 8, 1953, Pub. L. No. 83-226, 67 Stat. 490, 493 (1953) ("Any state or territory may at any time withdraw from this Compact by means of appropriate legislation to that end."); H.R.J. Res. 445, 75th Cong., 50 Stat. 719, 721 (1937) ("Either the state of New York or the state of New Jersey may[,] . . . without the concurrence of the other state, withdraw, . . . any of the functions, jurisdiction, rights, powers and duties transferred to the commission[.]").

[17] Though Defendants cite to four instances where unanimity is required to terminate a compact, those examples are fewer in number and otherwise inapposite. For example, though termed a "compact," the Southern Regional Education Compact never obtained Congressional approval. *See* Ark. Code Ann. § 6-4-101, art. VIII (West 2018) (explaining that the multi-state agreement "may be terminated at any time by unanimous action of the states"); *see also* Claire Carothers, United We Stand: The Interstate Compact as a Tool for Effecting Climate Change, 41 Ga. L. Rev. 229, 245 n.124-25 (2006); Frederick L. Zimmermann & Mitchell Wendell, The Law and Use of Interstate Compacts 21 (1976) ("[I]t was widely contended that the agreement was not of such a character as to require Congressional consent since the states are constitutionally in possession of power over education and the agreement would not affect the balance of power within the federal system."). Defendants exclusively rely upon multi-state compacts, (Gov.'s Opp'n Br. at 25, ECF 61-1), one of which requires an act of Congress or unanimity among the parties for termination, but which also permits states to withdraw unilaterally. *See* Northeast Interstate Low-Level Radioactive Waste Management Compact, Pub. L. No. 99-240, 99 Stat. 1909, 1922 (1986).

    d. <u>Sovereign Powers</u>

In analyzing the Compact drafters' intent, this Court remains cognizant that States do not easily cede their sovereign powers. *See Wayne Land & Mineral Grp.,* 894 F.3d at 527. However, this notion is not dispositive and a review of the Compact's legislative history, the parties' course of performance through the actions of their executive and legislative bodies, and the customary practices employed in other interstate compacts, strongly supports a finding that the drafters did not intend to permit a State's unilateral withdrawal or termination.

**V.**  **CONCLUSION**

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is **GRANTED**, and Defendants' Cross Motions for Summary Judgment are **DENIED**. An appropriate Order follows.

                     *s/ Susan D. Wigenton*_____
                     **SUSAN D. WIGENTON**
                     **UNITED STATES DISTRICT JUDGE**

Orig:   Clerk
cc:    Leda Dunn Wettre, U.S.M.J.
      Parties